UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| STEVEN PETERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:04-cv-1338-JDT-TAB |
| | ) | |
| GILEAD SCIENCES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 41, 43)[1]**

Plaintiff Steven Peters brings this action against his former employer, Defendant Gilead Sciences, Inc. ("Gilead"), alleging that Gilead unlawfully discriminated against him because he suffered a work-related injury and subsequently filed a worker's compensation claim and took medical leave.  In his complaint, Mr. Peters advances claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Family and Medical Leave Act ("FMLA" or the "Act"), 29 U.C.S. §§ 2601 *et seq.*, and Indiana state law.

Gilead now moves for summary judgment on all of Mr. Peters' claims pursuant to Federal Rule of Civil Procedure 56, contending that he fails to demonstrate any genuine issue of material fact in support of those claims.  Mr. Peters also moves for summary

---

[1]  This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

judgment on his FMLA claim, or, in the alternative, requests that the court bar Gilead's two affirmative defenses to that claim.  Both motions for summary judgment are fully briefed and ripe for determination.  The court now rules as follows.

## I.   BACKGROUND

Mr. Peters is a licensed pharmacist who Gilead employed full-time as a Therapeutic Specialist ("TS") from July 23, 2001 to May 14, 2003.  (Peters Dep. 10-11.) According to one of Gilead's Regional Directors and Mr. Peters' immediate supervisor, Arthur DelloStritto, Gilead is a pharmaceutical company headquartered in Foster City, California, that "develops and commercializes therapeutics to advance the care of patients suffering from life-threatening diseases." (DelloStritto Aff. ¶ 2.)  A Gilead human resources representative, Frank Romeo, reports that a TS works from home to represent and market Gilead's products and services to physicians, pharmacists, nurses and nurse practitioners within a defined geographic area.  (Romeo Dep. 55-56.)  A TS also manages territory budgets, customer contacts, speaker events and other miscellaneous expenditures.  (DelloStritto Aff. ¶ 3.)  As a TS, Mr. Peters was located in Indianapolis, Indiana, and responsible for Gilead's Midwest region, which includes Indiana, Southern Illinois and Western Michigan.  (Romeo Dep. 29-30.)

In November 2001, Mr. Peters injured his right shoulder when he was involved in a car accident, and reported the injury to Gilead.  (Peters Dep. 32, 102.)  He re-injured the shoulder on October 6, 2002 while traveling on business-related matters, and this time filed a worker's compensation claim.  (*Id.* 9, 32.)  On November 26, 2002, as a

result of the injury, Mr. Peters' physician, Dr. Stephen L. Kollias, placed him on work restrictions, and Gilead therefore modified his work duty.  (*Id.* 106.)  The modified duty continued until December 5, 2002, when Mr. Peters took medical leave to have surgery on his shoulder.  (Romeo Dep. 75.)  At that time, a Gilead human resources representative sent Mr. Peters a letter that Gilead contends is an incorrect notice that he was covered by the FMLA, and therefore had a right to twelve weeks of protected medical leave.  Mr. Peters did not use the full twelve weeks of leave, but instead returned to work on December 16, 2002, again with restrictions.  (*Id.* 75-76.)

On March 11, 2003, Dr. Kollias placed Mr. Peters on medical leave retroactive to March 4, 2003 because he was experiencing side effects from his use of a certain medication to control post-surgery pain.  (Peters Aff. ¶ 11.)  Gilead again placed Mr. Peters on medical leave, and sent him another FMLA notice that stated (incorrectly) that his FMLA protected leave would end on April 4, 2003.  (Peters Dep. Ex. 12.)  Dr. Kollias sent a letter to Gilead on March 25, 2003 indicating that Mr. Peters could not work until a follow-up appointment, but that he was expected to be able to return to work after that appointment.  (Romeo Dep. 102-104.)  He sent another letter on April 16, 2003, stating that he expected to release Mr. Peters to full work duty on May 5, 2003.  (Peters Aff. ¶¶ 5-6.)

Gilead contends that between March 25, 2003 and April 16, 2003, it did not know when Mr. Peters would be released to return to work.  (*Id.* ¶¶ 5-6.)  During this period, it began pursuing the possibility of terminating Mr. Peters' employment because of what it suggests was Mr. Peters' long history of poor job performance.  Beginning in early

3

2002, Mr. Peters' perceived poor performance in sales of Gilead's leading product led Mr. DelloStritto to counsel him that he needed to improve his sales by being more aggressive and increasing his use of Gilead resources.  (DelloStritto Aff. ¶ 7.)  Later in 2002, Mr. DelloStritto received a report from several nurse practitioners in Mr. Peters' region that they rarely saw Mr. Peters making sales calls, even though Mr. Peters' records stated otherwise.  (*Id.* ¶ 8.)

On February 4, 2003, Mr. DelloStritto conducted Mr. Peters' annual performance review.  He identified several problems, including Mr. Peters' low sales figures, failure to fully use Gilead's resources and failure to present all planned programs.  (*Id.* ¶ 10.) Shortly after this performance review, in response to a change in a scheduled event, Mr. Peters took several days vacation without permission.  (*Id.* ¶ 11.)  Gilead contends that on February 27, 2003, Mr. DelloStritto and several colleagues concluded that they needed to "develop a case to terminate Steve [Peters]."  (*Id.*  ¶¶ 11-12.)  Mr. DelloStritto states under oath that prior to March 4, 2003, he notified Mr. Peters that he and another colleague wanted to have a meeting in Indianapolis regarding Mr. Peters' performance. (*Id.* ¶ 13.)  He contends that at that meeting, he had intended to place Mr. Peters on a performance plan that would have given him 60 days to improve his sales, otherwise he would have been discharged.  (*Id.* ¶ 14.)  However, the meeting never happened.

On March 19, 2003, Gilead purportedly received another report from one of its clients that Mr. Peters was rude and condescending and therefore would no longer be permitted make sales calls to that client.  (*Id.* ¶ 15.)  The next day, Gilead decided to replace Mr. Peters.  (*Id.* ¶ 16.)  His discharge from the position of TS became effective

4

the date his FMLA leave was purportedly set to end—April 4, 2003.  (Romeo Aff. ¶ 8.)

Mr. Peters contends that Gilead never informed him of any need for him to return to

work, even though he contacted Mr. DelloStritto on April 14, 2003 when he received a

benefit check in an amount less than expected.  On April 21, 2003, Gilead hired an

individual to fill Mr. Peters' TS position.  (Romeo Dep. 153-56.)  That individual

accepted the position and began work on April 28, 2003.  (*Id.*)

On April 25, 2003, Gilead sent Mr. Peters a letter advising him that it considered

his position to be a "key position" under the FMLA, and Gilead therefore had replaced

him in the position of TS because he had been unable to work since March 4, 2003.

(Pl.'s Mot. Summ. J. Ex. 43.)  Gilead offered Mr. Peters alternative employment as a

Senior Sales Analyst at its headquarters in California, which was not eligible for a sales

incentive bonus program, did not allow Mr. Peters to have a company car, and required

relocation.  (Romeo Dep. 139-42, Romeo Aff. ¶ 11.)  However, if Mr. Peters would have

accepted the position in California, he would have received the same salary, been

allotted a relocation stipend of $2,000, along with thirty days temporary housing and

payment of the costs toward purchasing a home.  (*Id.* 147.)  Because Mr. Peters did not

communicate to Gilead his acceptance of the Senior Sales Analyst position, Gilead

officially terminated his employment on May 5, 2003.  (Romeo Dep. 151-52.)  Prior to

that, Mr. Peters' physician had released him to full work duty.  (Peters Dep. 117.)

5

## II.    DISCUSSION

Gilead moves for summary judgment on all of Mr. Peters' claims, contending that he fails to raise any genuine issue of material fact in support thereof.  It specifically argues that Mr. Peters fails to put forth any "direct evidence of discriminatory intent as to his sex or disability claims" (Mot. Summ. J. 17), or any evidence of pretext.  With respect to Mr. Peters' FMLA claim, Gilead contends that the Act is inapplicable to Mr. Peters' position.  As to Mr. Peters' related equitable estoppel claim, Gilead states that he fails to "prove he relied to his detriment upon Gilead's representation that he qualified for leave under the FMLA."  (Mot. Summ. J. 31.)  And finally, with respect to Mr. Peters' worker's compensation retaliation claim, Gilead suggests that Mr. Peters fails to show that its reason for his discharge is patently inconsistent with the evidence before the court and that there is insufficient proximity between the filing of his claim and his discharge.

In turn, Mr. Peters argues that he is entitled to judgment on his claim that Gilead "violated his substantive rights under the FMLA by failing to reinstate him upon his return from leave."  (Mot. Summ. J. 1.)  In the alternative, he requests that the court bar from consideration Gilead's affirmative defenses that he was not an "eligible employee" for FMLA coverage purposes, and even if he was, that he was a "key employee" who could be replaced lawfully under the FMLA, because the theory of equitable estoppel prevents application of those defenses to his FMLA claim.

## A.    Standard Of Review

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, *ITT Indus. Credit Co. v. D.S. Am., Inc.*, 674 F. Supp. 1330, 1331 (N.D. Ill. 1987), and the traditional rules for summary judgment will apply even though both parties have moved for summary judgment.  *Blum v. Fisher & Fisher*, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997).

## B.    Summary Judgment Will Be Granted On The Plaintiff's Title VII Claim.

Mr. Peters first claims that Gilead violated his right to be free from sex discrimination as protected by Title VII.  He contends that in not being permitted to return to his TS position after taking FMLA leave, he was treated differently than female

employees who took FMLA leave, particularly female employees who took maternity leave.  Gilead responds that Mr. Peters offers no evidence whatsoever in support of this claim, and therefore cannot establish a prima facie case of sex discrimination.

The court finds Gilead's arguments in support of summary judgment on Mr. Peters' Title VII claim persuasive, and the related undisputed facts support them.  As a result, and given Mr. Peters' failure to respond to Gilead's arguments in support of summary judgment on this claim, his Title VII sex discrimination claim will be dismissed. *See Stein v. Ashcroft,* 284 F. 3d 721, 725 (7th Cir. 2002) ("We will not search the record in an attempt to make Stein's arguments for her."); *Sanchez v. Henderson*, 188 F.3d 740, 746 n.3 (7th Cir. 1999) (stating that failure to mention theories in argument section of brief resulted in waiver).

### C.    Summary Judgment Will Be Granted On The Plaintiff's ADA Claim.

Mr. Peters also claims that Gilead violated his right to be free from disability discrimination as protected by the ADA.  Gilead moves for summary judgment on this claim, arguing that Mr. Peters was not disabled or regarded as disabled within the meaning of the ADA; and even if he were disabled, Gilead had an independent basis for his discharge—his poor work performance.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A "disability" is:

8

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  "It is the plaintiff's burden on summary judgment to demonstrate that he can come up with evidence to show he could meet his ultimate burden of showing a recognized disability." *Stein*, 284 F.3d at 727 (citing *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001) ("Contreras has the burden of presenting evidence to demonstrate that his impairment limited his ability to perform an entire class of jobs.")).

Mr. Peters argues that he fits within the first and third definitions of disability, actual disability and being regarded as disabled.  There is medical documentation in the record establishing Mr. Peters' right shoulder injury, including many patient status reports provided to Gilead by Dr. Kollias.  Yet, even though the record contains notations of Mr. Peters' injury, "[i]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198 (2002).  In *Toyota*, the Supreme Court made clear that a plaintiff must present more than evidence of a diagnosis of an impairment; he or she also must show the limitations the impairment actually causes. "[T]he ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Id.* (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999) (holding that monocular vision is not invariably a disability, but

must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment)) (citing 29 C.F.R. pt. 1630, App. § 1630.2(j) (2001) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.")).

Mr. Peters' medical condition—a right shoulder injury—is of the type discussed in *Toyota*: a condition that may be disabling in some cases but not in others.  *See Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 952 (7th Cir. 2000) ("Some impairments may be disabling for particular individuals but not for others, depending upon the stage of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors.") (quotation omitted).  Therefore, Mr. Peters must come forward with additional evidence sufficient for a jury to make an individualized assessment of the effect of his injury in his case.

The evidence of the limitations imposed on Mr. Peters due to his right shoulder injury at the time he was discharged is as follows.  Mr. Peters was placed on modified work duty in November 2002 by Dr. Kollias, who, in a worker's compensation patient status report, restricted Mr. Peters from working overhead and lifting over five pounds. At various subsequent times, Dr. Kollias placed different restrictions on Mr. Peters, such as limiting him to the use of his left hand and lifting lesser amounts of weight.  Dr. Kollias' patient status reports do little to reveal the practical implications of these restrictions, and there is little evidence in the record of any limitations on Mr. Peters' daily life resulting from therefrom.   After having surgery, Mr. Peters went through two

10

trial periods on the pain medication Neurontin, which caused him to stutter, stammer and experience increased drowsiness and visual problems.  Those complications were all short-lived, and admittedly related only to his having taken the pain medication.

This is the only evidence in the record regarding the limiting effects of Mr. Peters' right shoulder injury.  In determining whether this evidence is sufficient to raise a triable issue of fact as to whether Mr. Peters has a disability, the court must consider whether the limitations substantially affected one or more of his major activities of life.  *See* 42 U.S.C. § 12102(2) (a "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities of [the plaintiff]").  Mr. Peters must demonstrate that his injury posed a permanent or long-term limitation on a major life activity, meaning that it "prevent[ed] or severely restrict[ed] [him] from doing activities that are of central importance to most people's daily lives."  *Toyota*, 534 U.S. at 198. "Substantially limits" means that the person is either unable to perform a major life activity or is significantly restricted in the duration, manner or condition under which the individual can perform a particular major life activity, as compared to the average person in the general population.  *See* 29 C.F.R. § 1630.2(j); *Contreras*, 237 F.3d at 762.  The EEOC's regulations define "major life activities" as functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.  *See* 29 C.F.R. § 1613.702(c).

In his Response Brief, Mr. Peters claims he is substantially limited in the activities of "working overhead," "lifting," "using his right hand" and "driving and traveling."  (Resp. 31.)  These assertions alone are not enough for a jury reasonably to find that Mr. Peters

11

is substantially limited in the normal, everyday activities of living.  While working overhead and lifting have been claimed as major life activities, courts recently have questioned those categorizations, *see Toyota*, 534 U.S. at 200 ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."); *Mays v. Principi*, 301 F.3d 866, 869-70 (7th Cir. 2002) ("We doubt whether lifting more than 10 pounds is . . . [a major life activity].")  For example, in *Mack v. Great Dane Trailers*, 308 F.3d 776, 779 (7th Cir. 2002), an employee had work restrictions of "no lifting" and/or "no kneeling or squatting."  The court reversed a jury verdict for the employee on the grounds that he had not produced evidence he was substantially limited in the major life activity of lifting.  The court discussed the Supreme Court's *Toyota* decision and concluded, "*Toyota's* point was that an inability to perform 'occupation-specific' tasks does not necessarily show an inability to perform the central functions of daily life."  *Mack*, 308 F.3d at 781.  The court then discussed the application of *Toyota* to the facts of its case:

> that analysis applies equally to the work-related restriction at issue here.  An inability to lift heavy objects may disqualify a person from particular jobs but does not necessarily interfere with the central functions of daily life.  There may well be cases in which, because of the nature of the impairment, one could, from the work-restriction alone, infer a broader limitation on a major life activity.  An inability to lift even a pencil on the job might suggest an inability to lift a toothbrush, for example, or to otherwise care for oneself . . . .  But the work restriction in this case was not nearly of that nature, and instead fits neatly into the sort of occupation-specific limitation at issue in *Toyota*.

12

*Id.* (citing *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 617 (8th Cir. 1997) (holding mail-sorter with carpal tunnel syndrome who was restricted from lifting 20 pounds or performing repetitive activities with either hand did not demonstrate triable dispute regarding substantial limitation on major life activity)); *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) (holding as a matter of law that "twenty-five pound lifting limitation-particularly when compared to an average person's abilities-does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"); *Aucutt v. Six Flags Over Mid-America,* 85 F.3d 1311, 1319 (8th Cir. 1996) (holding plaintiff failed to show he was substantially limited in major life activities where "a 25-pound lifting restriction was the only medical limitation placed upon [plaintiff's] activities")); *see also Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114-17 (D.C. Cir. 2001) (reversing jury verdict for manual laborer whose back injury prevented him from lifting more than 20 pounds, or from returning to his job as a custodian, because he failed to satisfy burden of showing that injury to back had substantially limited his ability to work, so as to make him "disabled" within the meaning of the ADA); *McKay v. Toyota Motor Mfg.*, 110 F.3d 369, 373 (6th Cir. 1997) (holding woman with carpal tunnel syndrome and 20-pound lifting restriction not disabled because "at best, her evidence supports a conclusion that her impairment disqualifies her from only the narrow range of assembly line manufacturing jobs that require repetitive motion or frequent lifting of more than ten pounds.").  The Seventh Circuit in *Mack* concluded that because the employee's "no lifting" and "no kneeling or squatting" limitations were given in the context of work-related restrictions, the employee needed to produce additional evidence that he "was substantially limited in

13

the sort of lifting that is central to most people's daily life." *Mack*, 308 F.3d at 782.  In other words, "[u]nder *Toyota*, evidence of such a restriction, without more, is insufficient to show a substantial limitation on a major life activity."  *Id.* at 781.  The court held that because the employee failed to come forward with additional evidence, the jury's verdict for the employee had to be overturned.  *See id.* at 783-84.

Similarly, Mr. Peters' restrictions on working overhead, lifting and using his right hand while driving and traveling are stated in the context of his ability to work.  Dr. Kollias, who imposed the restrictions, saw Mr. Peters in the context of his worker's compensation claim, and imposed the restrictions in patient status reports issued to Mr. Peters' employer.  As in *Mack,* these work restrictions alone do not necessarily imply a broader limitation on any of Mr. Peters' major life activities outside of work.  This is not a case where Mr. Peters cannot lift a pencil.  *See Mack*, 308 F.3d at 781.  Mr. Peters' "inability to perform 'occupation-specific tasks' does not necessarily show an inability to perform the central functions of daily life."  *Id.*

Because of this, it becomes incumbent on Mr. Peters to produce evidence of his restrictions and how they create an inability to perform any major life activity.  And the scant evidence previously described concerning Mr. Peters' limitations on the central functions of life fails to create an issue of fact as to whether he was disabled within the meaning of the ADA.  Indeed, Mr. Peters himself testified in his deposition that he had the ability to complete most basic tasks of life, including walking, seeing, hearing, breathing, eating, caring for his personal needs, performing manual tasks and driving.

14

Similarly, Mr. Peters has failed to come forward with any evidence establishing that Gilead or its representatives regarded him as disabled for the purposes of the ADA. He contends that "Gilead . . . believed that the actual impairments Peters had, though in fact nonlimiting, would substantially limits [sic] major life activities."  (Resp. 32.) However, Mr. Peters offers no factual evidence supporting this contention.  The fact that his superiors, particularly Mr. DelloStritto, knew Mr. Peters was injured does not demonstrate that they regarded him as being substantially limited in the performance of major life activities.  *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) ("It is not enough for a plaintiff to show that the employer knew of the plaintiff's impairment."). Mr. Peters offers no evidence that Mr. DelloStritto or any other Gilead supervisor perceived him to be substantially limited in performing any major life activity, save awareness that he might need time off to rehabilitate his shoulder injury.  Moreover, the evidence suggests that Mr. DelloStritto believed Mr. Peters to be not disabled, but instead exaggerating his injury.  Indeed, no evidence in the record even remotely suggests that Gilead acted out of "myth, fear or stereotype" during its employment relationship with Mr. Peters.  *See Sutton v. United Airlines*, 527 U.S. 471, 489-90 (1999) (quoting 29 C.F.R. § 1630.2(l)) (the "regarded as" prong of the definition of disability is meant to "cover individuals rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities.").  For these reasons, the court finds that Mr. Peters was not disabled or regarded as disabled within the meaning of the ADA.  And because he cannot establish this threshold requirement for claiming discrimination under the statute, his disability discrimination claim against Gilead will be dismissed.

**D.   Summary Judgment Will Not Be Granted On The Plaintiff's FMLA Claim.**

Based on Gilead's refusal to allow him to return to the TS position he held prior to taking medical leave, Mr. Peters alleges a claim for deprivation of his substantive rights under the FMLA.  He argues that by not reinstating him to the TS position, Gilead violated 29 U.S.C. § 2614(a)(1), which provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave -- (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position . . . ."  At the summary judgment stage, an employee who alleges a substantive violation of the FMLA first must demonstrate by a preponderance of the evidence an entitlement to the benefits claimed.  *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001).  If the employee does so, "the employer may then present evidence to show that the employee would not have been entitled to her position even if she had not taken leave."  *Id.*  The ultimate burden rests on the employee, and as such he or she "must then overcome the employer's assertion."  *Id.*

In this case, for the court to grant judgment as a matter of law on Mr. Peters' FMLA claim, Mr. Peters first must demonstrate by a preponderance of the evidence his entitlement to the benefits alleged.  *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997).  He argues that it is undisputed that he was entitled to, requested and used FMLA leave.  Gilead responds by setting forth two affirmative defenses that it contends demonstrate that Mr. Peters has failed to meet his initial burden.  The

16

affirmative defenses are listed separately in Gilead's Answer: first, "Peters was not an employee for purposes of the FMLA."  (Answer ¶ 5.)  And second, "to the extent Peters was an employee under the FMLA, he was a key employee."  (*Id.* ¶ 6.)  Thus, Gilead believes that notwithstanding its approval of Mr. Peters' FMLA leave, it lawfully replaced him under the terms of the Act.

### 1.      The Defendant Is Equitably Estopped From Advancing Its Affirmative Defenses To The Plaintiff's FMLA Claim.

The FMLA states in part, "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period for one or more of the following : . . . because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Gilead's first affirmative defense is that Mr. Peters was not an "eligible employee" as defined by the FMLA, and therefore not entitled to the Act's protections.  Indeed, "the term eligible employee does not include . . . any employee of an employer . . . which employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50."  *Id.* § 2611(2)(B)(ii).  Put another way, the FMLA applies only to "eligible employees" of employers that employ fifty or more people and engage in interstate commerce.  *Fain v. Wayne Cty. Auditor's Office,* 388 F.2d 257 (7th Cir. 2004).  Gilead contends that because it does not employ at least 50 employees within 75 miles of Mr. Peters' worksite, he is not an eligible employee under the Act.

Gilead's second affirmative defense is that Mr. Peters was a "key employee" who could be replaced lawfully while on leave under the FMLA.  Indeed, it appears that Department of Labor Rules and Regulations allow for such an action, stating:

> c) an employer may deny job restoration to salaried eligible employees ("key employees," as defined in paragraph (c) of § 825.217) if such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer; or may delay restoration to an employee who fails to provide a fitness for duty certificate to return to work under the conditions described in § 825.310.

29 C.F.R. § 825.216.  A "key employee" is a salaried FMLA-eligible employee who is among the highest paid 10 percent of all the employees employed by the employer within 75 miles of the employee's worksite.  *Id.* § 825.217.  Gilead argues that because Mr. Peters was a key employee as defined by these regulations, his replacement and ultimate discharge, even if it occurred while he was on leave, was lawful.

Mr. Peters urges the court to equitably estop Gilead from advancing these "eligible employee" and "key employee" affirmative defenses because when he requested FMLA leave, Gilead advised him that he was qualified for leave under the Act and approved his request.  Mr. Peters relied on that approval and took the FMLA leave, and was replaced and discharged while on that leave.  Gilead admits that it most recently represented to Mr. Peters that he qualified for FMLA leave (which it now contends was a misrepresentation) in a March 17, 2003 letter from Denise Parsonage, Gilead's Human Resources Manager, advising him of his FMLA rights.  The letter states:

18

> You will retain your employee status during the period of your FMLA leave. . . . You will be guaranteed reinstatement in your position, or equivalent position, if you return to work by the time your FMLA leave expires.  In this case, your original leave began December 5, 2002, and you returned to work as of January 26, 2003 (7 weeks and 4 days).  Since you reestablished your leave as of March 4, 2004 [sic], you will need to return to work by April 4, 2003 (4 weeks and 3 days) to be guaranteed such reinstatement.

(Peters Dep. Ex. 12.)  Nearly the same language appears in an earlier letter from Ms. Parsonage to Mr. Peters.  On December 6, 2002, she wrote to him: "You will retain your employment status during the period of your FMLA leave. . . . You will be guaranteed reinstatement in your position, or equivalent position, if you return to work by the time your FMLA leave expires."

Mr. Peters contends that these statements demonstrate that Gilead should be equitably estopped from arguing that he was not entitled to leave protected by the FMLA.  The Seventh Circuit has approved of such an application of the theory of equitable estoppel in certain FMLA cases.  *Dormeyer v. Comercia Bank-Ill.*, 223 F.3d 579, 582 (7th Cir. 2000) (suggesting that where it is clear an employee was misled by her employer's silence as to her entitlement to FMLA leave, the employer may be estopped from pleading ineligibility as a defense to the employee's FMLA claims); *see also Kosakow v. New Rochelle Radiology Assoc., P.C.*, 274 F.3d 706 (2d Cir. 2001) (affirming the district court's decision to estop an employer from asserting an affirmative defense challenging an employee's FMLA eligibility when the employer's unintentional misleading behavior caused the employee to justifiably and detrimentally rely on the FMLA leave); *Woodford v. Cmty. Action of Greene County, Inc.*, 268 F.3d 51, 57 (2d

19

Cir. 2001) ("the doctrine of equitable estoppel itself may apply where an employer who has initially provided notice of eligibility for leave later seeks to challenge that eligibility. Thus, future employees who rely to their detriment upon the assurance of their employer that they qualify for leave under the FMLA may have recourse to the doctrine of equitable estoppel even without an enforceable regulation protecting their right to rely upon an employer's notice of eligibility."); *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481 (8th Cir. 2002) (affirming a district court's application of equitable estoppel in an FMLA case and collecting authorities).

The Supreme Court has defined equitable estoppel in the following terms:

> [i]f one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act . . . the first person is not entitled . . . to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

*Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984). The traditional elements of equitable estoppel are: 1) one party makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) the other party reasonably relies upon the misrepresentation; and 3) the misrepresentation causes detriment to the party asserting estoppel. *Kennedy v. United States,* 965 F.2d 413, 417 (7th Cir. 1992).

**a.    The Defendant Made Misrepresentations Of Fact To The Plaintiff Regarding His Status Under The FMLA Knowing That The Plaintiff Would Rely On Them.**

With regard to the first equitable estoppel factor, whether one party makes misrepresentation of fact to the other party with reason to believe that the other party will rely upon it, the court finds that this fact is without material dispute.  As described above, a Gilead human resources representative made certain and clear statements to Mr. Peters regarding his status under the FMLA.  The correspondence between Ms. Parsonage and Mr. Peters indicates that Gilead knew that Mr. Peters would rely on these statements in planning his surgery and subsequent medical leave.  Gilead had no reason to believe Mr. Peters would have doubted the veracity of the statements of its human resources representatives; and certainly it could not have reasonably expected that he, as a pharmacist, would have independent knowledge of the legal basis of those statements.  Therefore, the fact that Gilead made misrepresentations of fact to Mr. Peters with reason to believe that Mr. Peters would rely upon them has been proven.

**b.    The Plaintiff Relied On The Defendant's Misrepresentations Regarding His Status Under The FMLA.**

With regard to the second equitable estoppel factor, the other party reasonably relies upon the misrepresentation, Gilead contends that Mr. Peters cannot establish as a matter of law that he relied to his detriment on its statements that he was qualified for leave under the FMLA.  Specifically, it asserts that even if Mr. Peters wanted to return to work so as to avoid being discharged, he could not have done so because of his

medical restrictions.  The court finds this argument a bit too narrow.  Many reasonable

employees, when faced with the possibility of being replaced while on leave, would take

all measured steps to return to work to avoid being discharged, even if that meant

working through some level of pain.  The fact that Mr. Peters' physicians recommended

that he be placed on leave does not necessarily mean that he would or should have

followed that advice in the face of losing his job, particularly given the non-life-

threatening nature of his injury.  Indeed, Mr. Peters states in an affidavit that had he

known that Gilead was going to discharge him while he was on FMLA leave, he would

have attempted to work, even if he was in some level of pain.  While this testimony may

be self-serving, as Gilead contends, it is admissible as it goes to Mr. Peters' personal

knowledge of his reliance on Gilead's misrepresentations.  *See Buie v. Quad/Graphics,*

*Inc.,* 366 F.3d 496, 504 (7th Cir. 2004) (court may consider self-serving statements in

affidavits if they are based on personal knowledge and set forth specific facts); *Payne v.*

*Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (same).  As a matter of fact, Mr. Peters did

return to work for several months immediately following his surgery, despite having

experienced pain during that time period as well.

The fact that Mr. Peters took medical leave after surgery alone is enough to

demonstrate that he relied upon Gilead's statements that he qualified for leave under

the FMLA.  Therefore, as with the first equitable estoppel factor, the court finds that this

fact also has been proven.

### c.   The Defendant's Misrepresentations Caused Detriment To The Plaintiff.

Finally, with regard to the third equitable estoppel factor, the misrepresentation caused detriment to the party asserting estoppel, it is clear that Mr. Peters relied on Gilead's misrepresentations to his own detriment because he was replaced in his position of TS.  Also, if Gilead is allowed its two affirmative defenses, Mr. Peters may suffer harm.  This is a situation similar to that presented in *Allen v. Ft. Wayne Foundry Corp.,* 2005 U.S. Dist. LEXIS 21439 (N.D. Ind. Sept. 26, 2005), in which an employer was precluded from presenting the affirmative defense of ineligibility for FMLA leave to a plaintiff's claim under the Act.  The court concluded that if the employer were permitted to argue at trial that the plaintiff was ineligible for FMLA benefits because the plaintiff had not met the statutory minimum of one year of employment with the employer, the plaintiff would suffer detriment.  The court indicated that this was because the employer had granted in writing the plaintiff's intermittent FMLA leave request not once, but twice, stating, "if [the employer] is allowed to disclaim Allen's eligibility, Allen would theoretically be subject to termination not only for his fatal January 6 absence, but also for the twenty-four absences FWF told Allen were FMLA-excused."  *Id.* at *29.

Gilead was under a legal duty to inform its employees of the correct, applicable protections of the FMLA and what was required of the employees in order for them to qualify for those protections.  Because it incorrectly advised Mr. Peters of those protections, it denied him the opportunity to take leave under the shelter of the Act.  And as has been described by the Second Circuit:

23

> In such circumstances, it could not be argued that [the
> employee] had not met the requirements of the statute if this
> shortcoming were a result of [the employer's] failure to relay
> those requirements to her.  [The employee's] operation was
> not an emergency, but rather was long-planned and it would
> appear that there was no reason that it could not have been
> rescheduled.

*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 727 (2d Cir. 2001).

Like *Kosakow*, the present case provides a sufficient basis for the application of

equitable estoppel.  Therefore, Gilead will be precluded from presenting its eligible

employee and key employee affirmative defenses to the jury, and they will not be

considered in connection with the instant motions.

### 2.    There Is A Genuine Issue Of Material Fact As To Whether The Plaintiff Would Have Been Entitled To His Position Even If He Had Not Taken Leave.

Turning to the substance of Mr. Peters' FMLA claim, Gilead contends that this

claim must fail even if its affirmative defenses do not apply because Mr. Peters has not

shown that he was entitled to the position of TS in spite of his having taken leave.  It

asserts that it would have discharged Mr. Peters regardless of his leave status because

of his poor job performance.

If Mr. Peters did perform poorly as a TS, that fact would be a strong defense to

his substantive FMLA claim.  *See Ogborn v. U.F.C.W., Local No. 881,* 305 F.3d 763

(7th Cir. 2001) (summary judgment for an employer on an employee's FMLA claim was

affirmed because circumstantial evidence identified by the employee did nothing to

negate evidence that the employer discovered additional examples of poor performance, which entitled it to fire the employee in light of his performance history); *Strickland v. Water Works & Sewer Bd.,* 239 F.3d 1199 (11th Cir. 2001) (if an employer can show that it refused to reinstate an employee for a reason wholly unrelated to FMLA leave, the employer cannot be held liable under the FMLA). Here, the record is rife with examples of Mr. Peters' performance-related problems. Beginning in September 2002, even before Mr. Peters injured his shoulder, Mr. DelloStritto began to question whether Mr. Peters was falsifying records of his client visits. Apparently, several nurse practitioners working for a Gilead client reported to Mr. DelloStritto and others that Mr. Peters had not been making sales calls to them, even though his records indicated he was. Mr. DelloStritto raised this issue with Mr. Peters at the time, and requested that Mr. Peters increase his sales, more frequently use Gilead resources and increase the number of programs he planned and presented. Apparently, Mr. DelloStritto raised the issue of fraudulent calls with Mr. Peters again in 2003, when it appeared that the problem was continuing.

Through March 2002, Mr. Peters ranked 50 out 61 out of all TS's in his market share of sales of Gilead's leading product. In the second quarter of 2002, his market share ranked him 59 out of 61 TS's, and last in Gilead's Midwest region. According to Mr. DelloStritto, during that period he "repeatedly counseled Peters that he needed to improve his sales by being more aggressive and increasing his use of the Gilead resources made available to him." (DelloStritto Aff. ¶ 7.)

Mr. Peters had his annual performance review on February 4, 2003.  At that review, Mr. DelloStritto noted Mr. Peters' continued low sales figures.  He also noted Mr. Peters' failure to use Gilead resources and plan programs.  Shortly after his review, on February 26, 2003, after a speaker for an engagement he had planned requested to reschedule his appearance, Mr. Peters went on an unapproved vacation, sending Mr. DelloStritto an email that stated, "I've had it with this shit over programs.  I will be taking the rest of the week as vacation."  Mr. Peters did not return to work, but instead went on medical leave beginning March 4, 2003.  The day Mr. Peters sent that email, Mr. DelloStritto forwarded it to his supervisors, Helen Harris and Jim Meyers, and the next day he again emailed them requesting that he be permitted to "develop a case to terminate Steve [Peters]."

On March 18, 2003, Mr. DelloStritto received word from a Gilead client that Mr. Peters had been rude and condescending toward clinic staff, and that Mr. Peters no longer would be permitted to do presentations at that clinic.  The next day, Mr. DelloStritto sent an email to Mr. Romeo, Ms. Harris and Mr. Meyers in which he stated that the comments were "the most important reasons for us proceeding briskly with termination."  Gilead contends that the decision to terminate Mr. Peters' employment occurred on April 4, 2003.

The foregoing facts regarding Mr. Peters' alleged poor performance all suggest that Mr. Peters would not have been entitled to his position of TS even if he had not taken leave, thereby defeating his claim of entitlement to FMLA benefits.  However, there is also evidence in the record demonstrating that these reasons might have been

26

a pretext for Gilead's true reason for Mr. Peters' discharge, his having taken FMLA protected leave, which certainly would be a violation of the Act.

The most damning piece of evidence against Gilead in this respect is Mr. Romeo's April 25, 2003 letter to Mr. Peters stating that while Mr. Peters was indeed covered by the FMLA, he had to be replaced because his position of TS was a "key position." It specifically states, "Because you have been unable to work since March 4, 2003, it was necessary for Gilead to fill your position." Many other pieces of evidence in the record also suggest that Gilead may have discharged Mr. Peters because he took leave, rather than his poor performance. Mr. Romeo testified in his deposition that "if Peters had returned to work prior to April 4, he would not have been terminated." Gilead may spin this statement any way its chooses, including by saying that Mr. Romeo is not a lawyer and may not have understand the nuances of the FMLA, but at the very least the statement shows a basic recognition on the part of at least one Gilead employee that Mr. Peters' discharge resulted because he took leave, not because of his poor performance.

Also, there are disputed facts surrounding Gilead's decision to place Mr. Peters on a performance plan. First, it is unclear when Gilead decided to place him on such a plan. Mr. DelloStritto states that the decision was made before Mr. Peters went on leave, and that he was notified of it on March 4, 2003, the first day he was on leave. Apparently a meeting was scheduled to take place on March 14, 2003 to discuss the performance plan with Mr. Peters, and a plan was written up. However, there is no factual evidence in the record to support the timing of these decisions, and regardless,

Mr. Peters contends that he never received notice of a performance plan being implemented, or on what date a meeting about it was scheduled to take place.  A reasonable jury could conclude that the performance plan, which had not been discussed during Mr. Peters' first two years on the job (despite his purported poor performance during that time), was drafted after he went on leave simply as a pretext for discharging him for taking that leave.

In whole, this disputed evidence demonstrates that there exists a genuine issue of material fact as to whether Mr. Peters would have been entitled to the position of TS even if had not taken FMLA leave.  A reasonable jury very well could find that Mr. Peters was not entitled to the TS position because Gilead would have discharged him in spite of his leave status due to his poor performance.  However, a reasonable jury also could find that Gilead manufactured Mr. Peters' performance problems as justification for discharging him while he was on FMLA leave.  Either way, such a matter will be for a jury, and not this court, to decide.

### 3. There Is A Genuine Issue Of Material Fact As To Whether The Plaintiff Was Offered An Equivalent Position Upon Being Replaced.

The final FMLA issue raised by the parties remaining for the court's consideration is Gilead's defense that it fulfilled the terms of the FMLA by offering Mr. Peters a position equivalent to that of a TS upon his return from leave.  The court must decide whether the position of Senior Sales Analyst offered to Mr. Peters after he was replaced as a TS was equivalent to the position of TS under the terms of the FMLA.  Mr. Peters

28

argues it was not, and therefore Gilead denied his rights under FMLA by failing to

restore him to an equivalent position following his injury, in violation of 29 U.S.C. §

2614.  The Department of Labor regulations discuss an employee's right to restoration:

> (a) On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions or employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 C.F.R. § 825.214.

On this issue, viewing the evidence in favor of Mr. Peters, there is a genuine

issue of material fact as to whether the position of Senior Sales Analyst had the

equivalent benefits, pay and other terms and conditions as the position of TS.  The main

difference in the two positions was that the Senior Sales Analyst position was located at

Gilead headquarters in Foster City, California, whereas the TS position was located in

Indianapolis, Indiana.  In addition, if Mr. Peters had accepted the Senior Sales Analyst

position, Gilead would have provided him a $2,000 moving allowance, thirty days

temporary housing and covered the costs of his purchase of a new home.  The salary

and general benefits of each position were substantially similar, with the exception of

the TS's use of a company car and participation in a sales incentive bonus program.

A reasonable jury could conclude that based on these differences, the position of

Senior Sales Analyst was not equivalent to that of TS.  Of primary concern to the court

is the sales incentive bonus program.  While it is easy for Gilead now to claim that it would have compensated Mr. Peters for the loss of any bonuses received through that program through the award of a "transition bonus," there is no evidence in the record to support this statement, or that demonstrates that Gilead made such an offer to Mr. Peters.  Moreover, it is not clear that a one-time transition bonus would have fully compensated Mr. Peters for his loss of access to a bonus program available to him on a consistent basis as a TS, whether he fully benefitted from it or not.

As to the difference in location, at best, this argument advanced by Mr. Peters is neutral to the court's equivalency analysis; at worst, it is disingenuous, given that with regard to other issues Mr. Peters has argued fervently that his worksite was Foster City, California.  The benefits paid to Mr. Peters to move to California, or his costs incurred in such a move, constitute the transactional costs of relocation, rather than benefits of the position itself, and therefore also play little role in the court's decision here.

Based on these questions of fact, the court cannot make a judgment as a matter of law that the Senior Sales Analyst position was equivalent to the position of TS under the FMLA.  For this reason, and because Mr. Peters' poor performance raises the issue of his entitlement to FMLA benefits, his FMLA claim will proceed to trial, where the court will preclude the jury from hearing evidence of Gilead's eligible employee and key employee affirmative defenses under the doctrine of equitable estoppel.

### E.    Summary Judgment Will Be Granted On The Plaintiff's Retaliatory Discharge Claim.

Finally, Mr. Peters contends that Gilead unlawfully discharged him because he filed a worker's compensation claim in connection with his right shoulder injury.  Under Indiana law, an employee who is discharged in retaliation for filing a worker's compensation claim may recover damages for wrongful termination.  *Mack*, 308 F.3d at 784; *Frampton v. Cent. Ind. Gas Co.*, 297 N.E. 2d 425, 428 (Ind. 1973).  A plaintiff making a *Frampton* claim can survive summary judgment if he or she produces direct or indirect evidence that would support a finding that his or her discharge was caused by the filing of a worker's compensation claim.  *Mack*, 308 F.3d at 784*; Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002); *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999).  Causation may be inferred from "evidence that the employer's proffered reason for the discharge is 'patently inconsistent with the evidence before the court.'"  *Mack,* 308 F.3d at 784 (quoting *Markley*, 716 N.E. 2d at 565); *see also Goetzke*, 280 F.3d at 774.

Much of Mr. Peters' argument in response to Gilead's motion for summary judgment on his retaliatory discharge claim focuses on discovery disputes between the parties regarding production of documents related to other Gilead employees that had or had not filed worker's compensation claims.  He also argues at great length that some courts have found that the question of retaliation is one for a jury to decide, not the court, and therefore suggests that this court should do the same.  These arguments, which appear to have taken the place of a presentation of evidence in support of his

claim, simply are not enough to overcome Gilead's motion for summary judgment.  In short, Mr. Peters produces no direct or indirect evidence that would support a finding that his discharge was caused by his filing of a worker's compensation claim.[2]

When Mr. Peters filed a worker's compensation claim, Gilead never tried to interfere with his receipt of benefits, or insisted that Mr. Peters return to work prematurely.  Instead, the chain of correspondence between Gilead human resources representatives and Mr. Peters demonstrates that Gilead made every attempt to accommodate his need to be on worker's compensation leave.  For this reason, summary judgment on this claim will be granted.

_____

[2]  This claim differs from Mr. Peters' claim under the FMLA because it alleges unlawful discharge for having filed a worker's compensation claim only, as opposed to deprivation of the substantive right to leave under the FMLA.

## III.    CONCLUSION

For the reasons stated above, the court will **GRANT** in part and **DENY** in part the Defendant's Motion for Summary Judgment (Docket No. 41) and will **GRANT** in part and **DENY** in part the Plaintiff's Motion for Summary Judgment (Docket No. 43).  The Plaintiff's Title VII, ADA and worker's compensation retaliation claims will be dismissed, and judgment on those claims will be entered upon disposition of all remaining claims.[3] The Defendant's affirmative defenses likewise are disposed of.  One claim remains pending for a jury's consideration—Mr. Peters' substantive claim under the FMLA.

ALL OF WHICH IS ENTERED this 21st day of July 2006.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge Tim A. Baker

Denise K. LaRue
Haskin Lauter Larue & Gibbons
dlarue@hlllaw.com

Todd M. Nierman
Littler Mendelson PC
tnierman@littler.com

Mark Thomas Robbins
Haskin Lauter Larue & Gibbons
mrobbins@hlllaw.com

Dustin D. Stohler
Littler Mendelson PC
dstohler@littler.com

---

[3]  As this Entry does not dispose of all claims, it does not constitute a final judgment.