UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVEN PETERS,   )  | |
|            )  | |
|    Plaintiff,   )  | |
|            )  | |
|    vs.     )  | 1:04-cv-1338-JDT-TAB |
|            )  | |
|            )  | |
| GILEAD SCIENCES, INC.,   )  | |
|            )  | |
|    Defendant.   )  | |

**ENTRY ON DEFENDANT'S MOTION FOR RECONSIDERATION (Doc. No. 67)**[1]

Plaintiff Steven Peters, replaced while on medical leave, sues his former employer for violating the Family and Medical Leave Act ("FMLA").  *See* 29 U.S.C. § 2614(a)(1).  The FMLA specifically excludes from its protection employees whose employer has less than fifty employees within seventy-five miles of that employee's work site (also known as the "50/75 provision").  29 U.S.C. § 2611(2)(B)(ii).  Peters's former employer, Defendant Gilead Sciences, Inc. ("Gilead"), would like to argue that Peters does not satisfy the 50/75 provision.  But Gilead, either from its benevolence or oversight, represented to all its employees that they have the benefits of FMLA leave regardless of whether or not they met this requirement.  Previously, when deciding the parties' cross-motions for summary judgment (Doc. Nos. 41 & 43), the court ruled Gilead estopped from asserting the 50/75 provision because of representations Gilead

---

[1] This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

made to Peters about his eligibility.  (Doc. No. 65, at 17-24.)  Gilead now asks the court to reconsider that portion of the decision.  This second look at the estoppel argument leads the court to a very different result than previously announced.

I.      **BACKGROUND**

Gilead is a pharmaceuticals company based in Foster City, California.  (DelloStritto Aff. ¶ 2.)  Peters worked for Gilead as a Therapeutic Specialist—essentially a sales rep—covering Indiana, Southern Illinois, and Western Michigan.  (*Id.* ¶ 3.)  Gary DelloStritto is a Regional Director of Sales for Gilead based in St. Charles, Illinois.  (*Id.* ¶¶ 1,4.)  DelloStritto hired Peters, and Peters reported to DelloStritto.  (*Id.* ¶¶ 3-4.)  Gilead argues that St. Charles, Illinois, was Peters's work site.  Peters was expected to submit business plans to DelloStritto, attend regional meetings with him, and submit weekly expense reports, attendance records, daily call and activity reports to DelloStritto.  (*Id.* ¶ 5.)  DelloStritto conducted quarterly, mid-year, and annual performance reviews of Therapeutic Specialists like Peters.  (*Id.*)  Gilead employed less than fifty employees within seventy-five miles of St. Charles, Illinois.  (*Id.* ¶ 4.)

Peters's leave resulted from two work-related accidents.  Peters injured his right shoulder in a November 2001 automobile accident (Peters Aff. ¶ 4; DellotStritto Dep. 58-60), and aggravated it eleven months later while grabbing his carry-on luggage from the overhead storage on a commercial flight (Peters Dep. 32, 106; Romeo Dep. 68).  Peters began physical therapy, and in mid-November 2002, his doctor placed him on modified work duty with "no working overhead" and "no lifting over 15 pounds."  (Romeo

Dep. 68-72; Peters Dep. 106).  Peters went on medical leave in December 2002 to undergo shoulder surgery.  (Answer 2.)

Gilead's employee handbook explains its "Family and Medical Care Leave" policy.  It said that "all employees employed by the Company for at least twelve months and who have worked 1,250 hours during the twelve months preceding the commencement of leave" would receive leave.  (Pl.'s Ex. 24, at 39.)  It required employees to provide medical certification for taking medical leave and it had the ability to require medical certification to return to work.  The Handbook stated: "Gilead shall require from the health care provider a written certification certifying the need for the leave or alternative schedule on a form approved by and available from Human Resources."  (*Id.* at 40.)  It later stated:

> If an employee is granted a leave of absence under this policy because of his/her own serious health condition, the employee may not be permitted to return to work until he/she has presented Human Resources with a medical release form from the treating health care provider indicating that he/she is capable of returning to work.

(*Id.*)

December 6, 2002, Denise Parsonage sent Peters a letter "to outline your employment status during your Workers' Compensation leave of absence."  (Pl.'s Ex. 11; *see also* Romeo Dep. 78-79.)  This letter discussed the FMLA and said "[t]o be eligible for FMLA benefits, an employee must have worked for a covered employer for a total of 12 months and have worked at least 1,250 hours over the previous twelve months."  (Pl.'s Ex. 11.)  The letter does not mention the 50/75 provision.  It explained

that Peters will keep his employee status during his leave and is "guaranteed reinstatement in your position, or equivalent position, if you return to work by the time your FMLA leave expires." (*Id.*)

From Peters's return to work on December 20, 2002, until his medical leave began on March 4, 2003, he took several different medications. These medications gave him "no benefit, and in fact, some side effects." (Pl.'s Ex. 38, p. 3.) Although on January 24, 2003, Peters's doctor reported that "I think he is doing pretty well" (Pl.'s Ex. 36, p. 5), by late February, his doctor noted that he was still suffering pain and recommended he see a neurologist (Pl.'s Ex. 37, p. 2). On March 4, his neurologist evaluated his pain noting, "He did not have any unusual pain behaviors during the interview and did not seem overly distressed." (Pl.'s Ex. 38, p. 5.) In an attempt to "break[] the pain cycle" he proscribed a trial of Neurontin. (*Id.* at 6.) He did not require Peters to stay off work at this time; however, Peters did not return to work. A week later on March 11, 2003, Peter's doctor took him off work retroactive to March 4, 2003 explaining, "as of 3/4/03 my patient's condition requires treatment (medication) that will not allow him to work until doses adjusted . . . ." (Ex. 38, p. 9.)

In addition to the doctor's reports, Peters explained in his deposition that he took off work in February because of his health and that by March 4—before he began the Neurontin trial—he was not able to work because of his health:

Q And did you, in fact, take the rest of that week off?

> A  Yes.  I was feeling terrible.  I had increasing pain.  And I wanted to sit back and reflect upon what was happening in this situation and allow myself to hopefully overcome the pain, which did not happen.
>
> Q  So in response to something at work that was troubling, you took time off?
>
> A  No.  I took time off because I was frustrated with my health and frustrated over the circumstances of this—
>
> . . .
>
> Q  And isn't that exactly what you did on March 4, when you took leave because you were frustrated with what Mr. DelloStritto and Mr. Romeo—
>
> A  Not—
>
> Q  —were going to do?
>
> A  Not in a single sentence or second was that the thought.  I was ill.  I was becoming incapacitated.  And my health had deteriorated to the point that I could not perform my job.

(Peters Dep. 66-67.)[2]

The Neurontin trial that began March 4 caused Peters to stutter and stammer and experience increased drowsiness and visual problems.  (Peters Aff. ¶ 11; Peters Dep. 52-53.)  Over the next week and a half, his doctor attempted to modify the regimen to eliminate these side-effects with no success.  (Peters Dep. 116-17.)  On March 18, Peters's doctor gave up and discontinued Peters's Neurontin use temporarily to begin a second trial.  (Peters Aff. ¶ 12.)  This involved taking gradually increased dosages of

---

[2] According to DelloStritto, before March 4 he told Peters that he and Frank Romeo, Gilead's Director of Human Resources, wanted to meet with Peters in Indianapolis on March 14.  This meeting was for the purpose of presenting a performance improvement plan to Peters which would give him sixty days to "demonstrate marked improvement" by meeting certain goals.  If he did not, he would be terminated.  Peters's medical leave prevented them from ever presenting this plan.  (DelloStritto Aff. ¶¶ 13-14.)

Neurontin to find a dosage that relieved his pain without side effects.  (*Id.*)  This trial also proved unsuccessful.  (*Id.*)

Gilead sent Peters another letter from Denise Parsonage on March 17.  Like the December 6 letter, this letter discussed the FMLA and again stated, "[y]ou will be guaranteed reinstatement in your position, or equivalent position, if you return to work by the time your FMLA leave expires."  (Def.'s Ex. 12.)  Parsonage wrote that Peters's available FMLA leave ended April 4.[3]  In mid-April, Peters's doctor wrote to Gilead that Peters could return to work May 5.  (DelloStritto ¶ 18.)  Frank Romeo, Gilead's Director of Human Resources, responded to Peters with a letter stating that Peters was a "key employee" for FMLA purposes.[4]  (Def.'s Ex. 14.)  As such, his position needed to be filled in his absence and he could not return to his old job.  Peters was given the option of taking another job with Gilead in Foster City, California.  When Peters did not respond to this offer, he was terminated.  (Romeo Dep. 151-52.)

Romeo testified that the primary reason Peters was terminated was because Peters's territory was not being served in his absence.  (Romeo Dep. 122-23.)  Had

---

[3] Both sides concede that if Peters's was entitled FMLA's twelve weeks, Peters had until May 9, 2003 to return to work, not April 4.  (Romeo Dep. 99-101.)  Due to internal miscommunications however, Gilead believed throughout Peters's leave that the April 4 date was correct.  (Romeo Aff. ¶ 8.)

[4] This letter appears to be working from the assumption that Peters was eligible for FMLA.  It presents two defenses to the FMLA.  The first is the "key man" defense.  *See* 29 U.S.C. § 2614(b)(2). 29 U.S.C. § 2614(b)(2) provides an exemption for "the highest paid 10 percent of the employees employed by the employer within 75 miles of the facility at which the employee is employed."  Neither side believes this defense really applies to this case.  The second is the offer of an equivalent position.  *See* 29 U.S.C. § 2614(a)(1)(B).  The parties disagree as to whether the position offered by Gilead in this letter was really equivalent.

Peters returned to work before April 4, Romeo claims, Peters would not have been automatically terminated.[5] (*Id.* at 123.) Peters argues that had Gilead informed him that he did not qualify for FMLA, he would have returned before April 4 rather than lose his job.

Peters filed this suit August 16, 2004, advancing claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the FMLA. Both parties filed motions for summary judgment. (Doc. Nos. 41 & 43.) In its July 21, 2006, entry, the court granted summary judgment in favor of Gilead on the Title VII and ADA claim,

---

[5] However, Gilead now argues that its *real* reason for firing Peters was his poor performance. If Gilead would have fired Peters regardless of his medical leave, this would defeat Peters's FMLA claim. *See* 29 U.S.C. 2614(a)(3)(B) ("[The FMLA] shall [not] be construed to entitled any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave"); *Phelan v. City of Chicago*, 347 F.3d 679, 683 (7th Cir. 2003); *Kohl's v. Beverly Enters.*, 259 F.3d 799, 804 (7th Cir. 2001).

As stated in the court's previous entry, Gilead presented enough evidence on this point to raise a genuine issue of material fact. To briefly summarize: During Peters's medical leave, DelloStritto and several Gilead executives made plans for Peters's replacement. (DelloStritto Aff. ¶ 17.) DelloStritto conducted Peters's annual performance review the month before Peters's leave began and noted several deficiencies including low sales. (*Id.* at ¶ 10.) Presently, DelloStritto tried to place Peters on a performance plan, but Peters began his medical leave. On March 18, 2003, DelloStritto received a complaint that Peters was rude and condescending to a client's staff and would therefore not be allowed to make sales calls to that client. (*Id.* at ¶ 15.) The next day, after forwarding the complaint to some other Gilead employees, DelloStritto decided to replace Peters. (*Id.* at ¶ 17.)

Romeo seemed to believe that Peters had restoration rights until April 4 and so recommended Gilead wait until then to replace Peters. (Romeo Aff. ¶ 8.) Before his replacement had been hired, Peters's physician wrote to Gilead that Peters could return to work May 5. DelloStritto and Gilead did not change their mind about replacing Peters. (DelloStritto Aff. ¶ 18.)

Yet given Frank Romeo's letter and testimony, discussed *supra*, a reasonable jury could find that these performance issues were pretextual. For the purposes of Gilead's motion for summary judgment, therefore, it must be assumed that Gilead would not have fired Peters at all had he returned to work before April 4. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

but not on the FMLA claim. (Doc. No. 65.)  The court determined that Gilead was estopped from arguing Peters's FMLA eligibility under the 50/75 provision.  Gilead filed this "motion for reconsideration" on July 28, 2006.  (Doc. No. 67.)  Oral arguments were heard November 16, 2006.

## II.  DISCUSSION

A motion for reconsideration is "a motion that, strictly speaking, does not exist under the Federal Rules of Civil Procedure." *Hope v. United States*, 43 F.3d 1140, 1142 n.2 (7th Cir. 1994).  Although Gilead does not mention any specific Federal Rule in its motion, Federal Rule of Civil Procedure 54(b) states that an order "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."  The court will reexamine its entry pursuant to this rule much as it would a judgment under Rule 59(e).  *Cf. Demos v. City of Indianapolis*, 302 F.3d 698, 706 n.11 (7th Cir. 2002) (analyzing a motion made under similar circumstances under Rule 59(e)).  The motion will be granted if there was a mistake of law or fact in the previous entry.  *See Figgie Int'l, Inc. v. Miller*, 966 F.2d 1178, 1180 (7th Cir. 1992).

Originally, these issues came before the court in cross-motions for summary judgment.  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When deciding a motion for

summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, *ITT Indus. Credit Co. v. D.S. Am., Inc.*, 674 F. Supp. 1330, 1331 (N.D. Ill. 1987), and the traditional rules for summary judgment will apply even though both parties have moved for summary judgment, *Blum v. Fisher & Fisher*, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997).

The FMLA "balanc[es] the demands of the workplace with the needs of families . . . [and] entitle[s] employees to take reasonable leave for medical reasons . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b).  It requires employers to give eligible employees up to twelve work weeks of leave every twelve month period for certain family and health events including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  Employers must return eligible employees to the same or equivalent position. 29 U.S.C. § 2614(a)(1).  Yet, Congress "recognize[d] the difficulties an employer may have in reassigning workers to geographically separate facilities." H.R. Rep. No. 102-135(I), at 37 (1991).  So, in order to be eligible, the employee must be employed at a work site at which there are at least fifty employees within a seventy-five mile radius. 29 U.S.C. § 2611(2)(B)(ii).

Because Gilead represented to Peters that he was eligible for the FMLA, Peters would like to avoid the question of eligibility altogether by having the court estopp Gilead from arguing it.  The Seventh Circuit has never held equitable estoppel applicable to an FMLA claim; however, in dicta, it has suggested estoppel may be permissible.  *See Dormeyer v. Comerica Bank-Ill.*, 223 F.3d 579, 582 (7th Cir. 2000).  Other circuits have explicitly held so.  *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481 (8th Cir. 2002); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001).  The traditional elements of equitable estoppel are: 1) one party makes a misrepresentation of fact to the other with reason to believe that the other party will rely on it; 2) the other party reasonably relies upon the misrepresentation; and 3) the misrepresentation causes detriment to the party asserting estoppel.  *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992).  The parties agree that Peters satisfies the first element.  They disagree about the second and third.  Peters claims he relied on Gilead's misrepresentations when deciding on his course of treatment and that this cost him his job.  Gilead argues Peters could not have suffered detriment because has not shown how he might have returned to work in order to keep his job.

Peters's strongest—and really only—evidence of reliance is his own assertion in his affidavit.  Gilead points out that "conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact."  *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002).  But it is not the *self-serving* character of the statements that create problems, it is the affiant's lack of personal knowledge.  *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).  Although personal knowledge may include

reasonable inferences, those inferences must be "grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Id.* (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)).  If an affidavit states facts based on personal knowledge or observation, even if self-serving, it can create a factual issue for trial.  However, the affidavit cannot contradict prior deposition testimony.  *See Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998).  Neither will an invitation to speculate create a factual dispute.  *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1152 (7th Cir. 1989).

Gilead asks the court to adopt the reasoning of *Sewell v. Chicago Transit Authority*, No. 99 C 8372, 2001 WL 40802 (N.D. Ill. Jan. 16, 2001), to either deny Peters's motion for summary judgment or grant Gilead's motion for summary judgment on the estoppel issue.  In *Sewell*, the district court granted summary judgment for an employer on its employee's assertion of equitable estoppel.  Sewell was declared psychologically unfit to work by his employer and given FMLA paperwork, which he submitted.  After six weeks, his employer rejected his application because he did not qualify for FMLA.  At the same time, his employer began looking for a replacement and by the time Sewell was cleared to return to work, his replacement had begun.  Sewell claimed, in an affidavit, that had he known he did not qualify for FMLA, he would have returned to work sooner.  The court rejected this argument, explaining "[t]he facts reveal that Sewall was not cleared to return to work until [after his employer began looking for his replacement] by his own doctor and until [the day his replacement began] by CTA."

*Id.* at *8. The court continued: "There are no other facts in this case, outside of Sewall's own self-serving statements, to establish that Sewall was ready for work earlier than February 8th." *Id.*

In his affidavit, Peters claims he relied on Gilead's misrepresentations. According to Peters, the key moment he relied on Gilead's misrepresentations was his March 18, 2003, decision to undergo a second trial of Neurontin. In particular, he states:

> During this period of time, if I had known that I was not eligible for FMLA leave, I would have refused to undergo the second trial of Neurontin treatment. In communications with Marsha Roberts and Frank Romeo during this time, I was never told that my job was in jeopardy. If, in fact, I had known that my job was in jeopardy, I would have either insisted upon some other course of treatment or, barring that, I would have simply returned to work, albeit in pain. I would have done whatever I could to get back to work, even if it meant working in pain.

(Peters Aff. ¶ 14.) He continues that he could have chosen to work instead of undergoing this second treatment because he "had already worked while tolerating [his] condition from December 16, 2002 to March 4, 2003." (*Id.* at ¶ 15.) Peters does not claim that he might have foregone *all* his leave from March 4 to May 5; rather, he claims that he might have shortened it to return before April 4.

Gilead contends that Peters's earlier statements at his deposition contradict his claims in the affidavit. There was an exchange about whether or not Peters could have worked that went as follows:

> Q Your health prohibited you from working between March 4, when you started your leave, and May 6, when you were released from your leave, correct?
>
> A That is an inaccurate characterization.
>
> . . .
>
> Q Is it your testimony, then, today that you were able to work during that time?
>
> A That is not what I'm trying to tell you.  I contacted my physician to release me to handle this situation on May the 2nd, and then called him when I received the phone call on May the 1st to tell him I want a thorough examination, because I have been dismissed from my job.
>
> Q Your doctor released you to return to work as of May 5 or 6.  That's a documented fact.
>
> A There's also a document that I believe is there for May the 2nd.
>
> Q Okay.  Well, let's go with that date, then.  Maybe that's where our confusion lies.  Between March 4, 2003, when you began your leave, and May 2, 2003, you were unable to work?
>
> A Yes I was.

(Peters Dep. 69.)

Peters's statements in his affidavit are admissible up to a point—unfortunately for Peters, not up to the point that matters.  To the extent that Peters is explaining what he would have done, these statements are permissible.  *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004).  These statements do not directly contradict his deposition testimony.  Peters was not capable of working from March 4 to May 5, but it appears that at least one reason for this was the side effects from his medication.  Peters claims he would have chosen not to take this medication had he known he did not qualify for FMLA.  It is not logically inconsistent for Peters to say that he would have

asked for an alternate treatment and that he would have tried to go back to work earlier than May 5.

But the trier of fact would have to speculate in one of two ways to make his statements relevant to the question of detrimental reliance.  To prevail on an estoppel claim, Peters needs the trier of fact to find that he would have been back to work before April 4.  If Peters got either an effective alternative treatment or went back to work without any treatment, this might be true.  For the first theory, the trier of fact would have to assume that when Peters demanded another treatment from his doctor, there really was an alternative treatment available that would have got him back to work by April 4.  In his oral arguments, Plaintiff argued that he and his doctor made the decision to go with this particular treatment as opposed to something else based on his understanding that he had FMLA leave.  But there is nothing in the record to support that assertion, not even the plaintiff's post-deposition affidavit.  With no evidence on record about alternative treatments, this is pure speculation.

For the second theory, the trier of fact would have to assume that if Peters told his doctors he was going to go back to work without treatment, the doctors would have let him.  Gilead could require documentation from a doctor to return to work.  (Pl.'s Ex. 24, at 40.)  There is no evidence in the record that Peters's doctors would have let him

go back to work,[6] or that absent a doctor's release Gilead would have let him come back to work from his medical leave.[7]

In oral arguments, Plaintiff argued that the only reason Peters was unable to work was because of the symptoms he experienced from the Neurontin. After all, his doctor had not taken him off work until the Neurontin had caused side effects. Had Peters not chosen to be on this medication for the second trial, the logic goes, he could have worked, albeit in pain. Ergo, his doctor would have had no reason to keep him off work. But the record belies this theory. According to Peters himself, his health prevented him from working before he began the Neurontin trial. In particular, he stated the reason he stopped working on March 4 was: "I was ill. I was becoming incapacitated. And my health had deteriorated to the point that I could not perform my

---

[6] Peters cites to none. The court found only one reference in Peters's medical records which could even arguably support this. On Peters's March 25, 2003, visit to his doctor, his doctor placed him on leave for at least two more weeks stating, "I did not feel a prolonged time off work would be counterproductive." (Pl.'s Ex. 40, at 4.) This *could* indicate that the time off work was not necessary; however, it remains a long way from bridging this logical chasm and thus from creating a genuine issue of material fact. Besides, several weeks later, when Peters saw his doctor, he was still not released, and he "was reluctant to return to work given the need for continued Valium." (Pl.'s Ex. 41, at 3.)

[7] Certainly, the exchange mentioned above from Peters's deposition indicated that he believed he needed to get a release from his doctor before returning. (Peter's Dep. 69.) He obtained a doctor's release to come back from his surgery a few months before. (Pl.'s Ex. 34, at 5.) Both of the letters from Gilead about his medical leave mentioned a doctor's release. (Pl's. Exs. 11, 12.)

job." (Peter's Dep. 67.)[8]  Peters has not presented enough evidence for a reasonable jury to find he would have returned to work by April 4.

Peters makes much of the fact that, unlike the employee in *Sewell v. Chicago Transit Authority*, he claims to have relied on his employer's affirmative misrepresentations, not his employer's silence.  This in no way relieves him of his burden to show detrimental reliance.  As explained above, he has not shown detrimental reliance on Gilead's statements; therefore, Gilead will not be estopped from arguing Peters's eligibility for FMLA.

Because Gilead is not estopped from arguing Peters's eligibility, Peters's eligibility must be determined.  29 C.F.R. § 825.111(a)(2) deals with employees with "no fixed worksite" like salespersons and explains that the work site is where the salesperson reports to and receives assignments from.  It states:

---

[8]  It is true that plaintiff swears in his post-deposition affidavit that he would have returned to work despite residual pain had he known that his job was in jeopardy.  In its July entry, the court also recognized the general proposition that many employees work through suffering pain to avoid adverse employment consequences.  Entry on Mots. for Summ. J. 22. However, on reconsideration, it is doubtful that the plaintiff can impeach his deposition testimony that his health had deteriorated to the point he could not perform his job and that he was unable to work during the relevant period through his own subsequent affidavit.  On closer scrutiny, the court now realizes that there is no fact or reasonable inference available in the record from which it can conclude that the plaintiff was one of those individuals who would have soldiered on to work despite debilitating pain.  Moreover, the record is replete with Dr. Gregori's reports indicating that the plaintiff could *not* work during the relevant time period.  (Pl.'s Exs. 39-41.)  What the record lacks is a medical release for the Plaintiff to return to work before April 4, a precondition for his return to work at Gilead.  There is nothing to support the speculative assumption that the plaintiff would have the court make that Dr. Gregori would have changed his opinion from "could not work" to "could work" merely at Plaintiff's request.  The Plaintiff's unsupported assertion that he would have returned to work is not enough to bridge that gap.

> An employee's personal residence is not a worksite in the case of employees such as salespersons who travel a sales territory and who generally leave to work and return from work to their personal residence, or employees who work at home, as under the new concept of flexiplace. Rather, their worksite is the office to which the [sic] report and from which assignments are made.

29 C.F.R. § 825.111(a)(2). Gilead has provided the affidavit of Gary DelloStritto, Peters's supervisor, stating that Peters reported to DelloStritto and received his assignments from him. (DelloStritto Aff. ¶ 4.) DelloStritto was based in St. Charles, Illinois, and Gilead did not have fifty employees within seventy-five miles of St. Charles, Illinois. (*Id.*) Thus, Gilead argues, Peters does not qualify for FMLA protection.

Peters never makes an argument in his submissions to the court that he is eligible for FMLA absent estoppel; however, he argues that Foster City is his work site for the purposes of the key man defense.[9] If his work site were Foster City, the 50/75 provision would not disqualify him for the FMLA. Peters notes that Gilead treats all Therapeutic Specialists as Foster City employees and that on his termination paperwork, Gilead identified his work site as Foster City.

Gilead retorts with *Cianlini v. Nilfisk-Advance America, Inc.*, No. Civ. A 99-3954, 2000 WL 230215 (E.D. Pa. Feb. 28, 2000), where the court decided on summary judgment that a sales force should not be considered a part of the number of employees

---

[9] Peters—and the court in its July 21, 2006, entry—made the assumption that Gilead was asserting a key man defense given Frank Romeo's May 2003 letter to Peters. Upon closer examination, Gilead never asserted this defense in its briefs on the cross-motions for summary judgment. In defending against the key man defense, Peters made an argument that, if successful, would save his eligibility against the 50/75 provision—that his work site is Foster City, California.

at a company's headquarters when the salespersons report to and receive assignments from regional managers spread throughout the country. That case relied on *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139 (3d Cir. 1998),[10] containing an elaboration of these "assignment" and "reporting" prongs. For the assignment prong the court stated the "concern here is with the source of the 'day-to-day' instructions received by the sales representatives, notwithstanding centralized payroll and certain other centralized managerial or personnel functions." *Id.* at *4 (quoting *Ciarlante*, 143 F.3d at 147). The reporting inquiry "focuses on the location of the personnel who were primarily responsible for reviewing sales reports and other information sent by the sales representatives, in order to record sales, assess employee performance, develop new sales strategies, and the like." *Id.* at *5 (quoting *Ciarlante*, 143 F.3d at 148).

Using this guidance, it is clear that Peters's work site is St. Charles. As Regional Director, DelloStritto was Peters's primary contact with the company. It was also DelloStritto who reviewed Peters's work. Peter's evidence to argue that this was not the case—the payroll and internal designation—is irrelevant. As the reasoning of *Cianlini* makes clear, it is not problematic that DelloStritto's personal residence serves as the work site for the salespersons under him. *Id.* at *6. It would defeat the purpose of the 50/75 provision, if it did not exclude a geographically dispersed sales force from the

---

[10] *Ciarlante* was a case under the Worker Adjustment and Retraining Notification ("WARN") Act, not the FMLA. However, as the court in *Cianlini* explained, Congress intended the term "work site" in the FMLA to be defined in the same way as "single site of employment" under WARN. *Cianlini*, 2000 WL 230215 at *4 (citing S. Rep. No. 103-3 (1993)).

requirements of the FMLA. Thus, Peters's work site is St. Charles and he does not qualify for FMLA protection.

### III. CONCLUSION

Having had the opportunity to examine this issue more closely, the court reaches a different conclusion from that in its July 21, 2006 entry. For the reasons set forth above, Gilead is not estopped from arguing Peters's eligibility for FMLA. Peters's work site is St. Charles, Illinois; thus, he does not qualify for FMLA under the 50/75 provision. Defendant's Motion for Reconsideration (Doc. No. 67) is **GRANTED**. Summary judgment is therefore **GRANTED** for Gilead on Peters's FMLA claim. The court's previous rulings granting summary judgment on Peters's Title VII and ADA claims stand. *See* Entry on Mot. for Summ. J. 7-15. Therefore, Gilead's motion for summary judgment on all claims is **GRANTED**.

ALL OF WHICH IS ENTERED this 20th day of November 2006.

John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge Tim A. Baker

Denise K. LaRue
HASKIN LAUTER LARUE & GIBBONS
dlarue@hlllaw.com

Michael A. Moffatt
LITTLER MENDELSON PC
mmoffatt@littler.com

Todd M. Nierman
LITTLER MENDELSON PC
tnierman@littler.com

Mark Thomas Robbins
HASKIN LAUTER LARUE & GIBBONS
mrobbins@hlllaw.com

Dustin D. Stohler
LITTLER MENDELSON PC
dstohler@littler.com